IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 1, 2024 Session

**STATE OF TENNESSEE v. GARY LYNN HART**

**Appeal from the Circuit Court for Chester County**
**No. 21-CR-4 Donald H. Allen, Judge**

_____

**No. W2023-01103-CCA-R3-CD**
_____

The Defendant, Gary Lynn Hart, was convicted in the Chester County Circuit Court of two counts of possession of a firearm after having been convicted of a violent felony, a Class B felony; one count of theft of property valued more than one thousand dollars, a Class E felony; and one count of resisting arrest, a Class B misdemeanor, and received an effective sentence of thirty-one years in confinement. On appeal, the Defendant claims that the evidence is insufficient to support his convictions. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JILL BARTEE AYERS, JJ., joined.

Raven Prean-Morris (on appeal), Assistant Public Defender - Appellate Division; Jeremy Epperson (at trial), District Public Defender, Jackson, Tennessee; Kandi Colon (at trial), Assistant Public Defender, Jackson, Tennessee; and Samuel W. Hinson (at trial), Lexington, Tennessee, for the appellant, Gary Lynn Hart.

Jonathan Skrmetti, Attorney General and Reporter; Harrison Gray Kilgore, Assistant Solicitor General; Whitney Hermandorfer, Director of Strategic Litigation; Jody Pickens, District Attorney General; and Eric Wood, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# FACTS

In February 2021, the Chester County Grand Jury returned a twenty-five-count indictment, charging the Defendant with twenty counts of possession of a firearm by a convicted felon, two counts of theft, and one count each of resisting arrest, evading arrest, and disorderly conduct. Before trial, the State dismissed nineteen counts, leaving the Defendant charged with theft of property valued more than one thousand dollars in count one; possession of a Remington firearm after having been convicted of a violent felony in count two; resisting arrest in count twelve; evading arrest in count thirteen; disorderly conduct in count fourteen; and possession of a Sig Saur handgun after having been convicted of a violent felony in count sixteen. The trial court bifurcated the trial, with the jury first hearing evidence related to the Defendant's charges of felony theft, resisting arrest, evading arrest, and disorderly conduct.

Officer Kyle Carter of the Henderson Police Department ("HPD") testified that on the night of January 5, 2020, he and Sergeant Michael Rhodes were dispatched to "Pinehurst and Cedarhurst" due to a report that "a firearm had been discharged." En route, the officers learned the discharge had occurred near 521 Frankie Lane. Officer Carter and Sergeant Rhodes had been to that area a few times in the past few days but had not been able to make contact with a suspect. Therefore, they decided to park their patrol cars nearby and walk to the scene. The State asked if Officer Carter was "familiar with who stayed at that address," and he said yes. The State then asked, "And who -- who stayed at that address according to your knowledge?" Officer Carter responded, "Gary Hart and his brother, Jerry Hart."[1] The State asked Officer Carter to point out Gary Hart in the courtroom, and he identified the Defendant.

Officer Carter testified that as he and Sergeant Rhodes were walking toward 521 Frankie Lane, they saw the silhouette of a person standing in the street under a streetlight. The person moved into the light, and Officer Carter recognized the Defendant. Officer Carter noticed the Defendant was wearing the same coat the Defendant had been wearing the previous day and called out, "Gary, stop." The Defendant walked toward 521 Frankie Lane as the officers continued telling him to stop. The Defendant yelled obscenities back at the officers and said he was on his property. Officer Carter thought that the Defendant was "acting suspicious" and that the situation could be dangerous. He pointed his firearm at the Defendant, and Sergeant Rhodes aimed a taser at the Defendant. When the officers caught up to the Defendant, Officer Carter reholstered his gun and tried to handcuff the Defendant. However, the Defendant was "resisting and cursing." The State asked what Officer Carter meant by "resisting," and he stated, "Pulling away from me, saying that he

---

[1] Because the Defendant and his brother share a surname, we will refer to his brother as "Jerry" for clarity. We mean no disrespect to Jerry Hart.

was not going to -- he was on his property, and we had no right." Sergeant Rhodes deployed his taser, but the Defendant was wearing a leather coat that the taser prongs could not penetrate effectively. The officers "struggled" with the Defendant until additional officers arrived and helped them take the Defendant into custody. Even after the Defendant was in custody, he continued to yell and threaten the officers. The officers put him into a patrol car and began searching the area for a firearm.

Officer Carter acknowledged that he was wearing a "bodycam" at the time of the incident, and the State played a portion of his bodycam video for the jury. The video showed Officer Carter ordering the Defendant to stop and struggling with the Defendant.

On cross-examination, Officer Carter testified that according to Google Maps, "Pinehurst and Cedarhurst" was five hundred yards from 521 Frankie Lane. A shooting range was about one mile from the scene. Officer Carter and Sergeant Rhodes parked their cars on Trice Street and walked to 521 Frankie Lane so as not to be seen by whoever was firing the gun. When the officers first saw the Defendant, he was not committing a crime. However, the officers wanted to ask him some questions about the shots fired call. Officer Carter said he did not know how much time passed between his receiving the dispatch and his seeing the Defendant but that it took him about one minute to walk from his patrol car to where he initially saw the Defendant.

Officer Carter testified that the Defendant did not run away but that the Defendant walked away "at a fast pace." The officers did not have to run to catch up to him but "stepped up [their] pace." The Defendant was not obeying or complying with the officers' commands, so the officers decided that using the taser was "a safer option." After the officers took the Defendant into custody, they did not find any weapons on his person.

Sergeant Michael Rhodes of the HPD testified that he accompanied Officer Carter to 521 Frankie Lane. Sergeant Rhodes knew Gary and Jerry Hart lived at that address, and he identified the Defendant in the courtroom as Gary Hart. The officers parked their patrol cars on Trice Street and walked toward Frankie Lane. Sergeant Rhodes said they were using a "sneak approach" because they knew the Defendant and had dealt with him previously. As the officers got to the intersection of Trice Street and Frankie Lane, they saw the Defendant standing by a stop sign, watching them. They ordered him to stop and shined their flashlights on him. The Defendant started walking into a neighbor's yard and said he did not have to stop because he was on his own property. The officers drew their guns, but the Defendant still did not stop.

Sergeant Rhodes testified that he deployed his taser on the Defendant but that the taser was not successful because the Defendant was wearing a thick leather jacket. The

officers "ended up having to hold" the Defendant until two other officers arrived, and the four of them took the Defendant into custody and put him into a patrol car. Sergeant Rhodes then searched the area and found a seven-millimeter rifle casing just a few yards from where the Defendant had been standing when the officers first saw him. Sergeant Rhodes also found a twenty-five-caliber automatic shell casing "pretty close" to the back door of 521 Frankie Lane. He said both of the casings were "in clean condition like they hadn't been there long."

On cross-examination, Sergeant Rhodes testified that the Defendant was about sixty yards from 521 Frankie Lane when the officers first saw the Defendant and that the Defendant was not committing a crime. Sergeant Rhodes and Officer Clark were going to detain the Defendant, not arrest him, and Sergeant Rhodes thought he and Officer Clark identified themselves and "requested him to stop." The Defendant refused, walked away, and was in a neighbor's yard when the officers got to him. Sergeant Rhodes stated, "He kept saying it was his yard, but it was a neighbor's yard." The Defendant refused to comply with the officers' commands and was "very irate" while the officers were trying to handcuff him, so Sergeant Rhodes deployed his taser. Sergeant Rhodes also tried to "dry stun" the Defendant a couple of times while he and Officer Clark were "wrestling around" with the Defendant. Sergeant Rhodes never saw the Defendant at 521 Frankie Lane and estimated that the entire encounter lasted about ten minutes. He acknowledged that the two casings were found in different locations.

Officer Danielle Cook of the HPD testified that she responded to the shots fired call at 521 Frankie Lane. She said that the call initially reported gunshots in the Arrington Estates area but that a subsequent call reported gunshots at "the Hart residence." When Officer Cook arrived, she heard yelling and the deployment of a taser. She ran toward the sounds and saw the Defendant "on the ground fighting" with three law enforcement officers. Officer Cook helped the three officers take the Defendant into custody and lead him to her patrol car. As they were doing so, the Defendant "continued to resist us, fighting." Officer Cook drove the Defendant to jail. She said he made comments to her and called her names "the whole ride." Officers searched the Defendant at the jail and found two bullets on his person. On cross-examination, Officer Cook testified that she did not recall the caliber of the bullets and did not remember the officers finding any keys on the Defendant's person.

Assistant Chief Tim Crowe of the HPD testified that he arrived at the scene after the Defendant had been taken into custody and that he helped search the area outside 521 Frankie Lane for evidence. Assistant Chief Crowe said he knew the Defendant lived in the home. Due to the shots fired call, officers wanted to "clear" the residence to make sure

- 4 -

that no victims were inside and that no one was in danger. The Defendant's brother, Jerry, later arrived and gave Assistant Chief Crowe consent to enter the house.

Assistant Chief Crowe testified that while he was clearing the residence, he found a rifle in a black case underneath a bed in one of the bedrooms. The rifle was a Remington Model 700 bolt-action hunting rifle. A "blister case" was inside the black case and contained ten rounds of seven-millimeter ammunition that "would go with this rifle." Two rounds were missing from the blister case, and the cartridge casing found by Sergeant Rhodes was the "same type" of ammunition as the ammunition in the blister case. Assistant Chief Crowe later checked the national crime database, NCIC, and learned the rifle had been reported stolen in Jackson, Tennessee.

On cross-examination, Assistant Chief Crowe testified that he did not find any mail addressed to the Defendant or any form of identification for the Defendant inside the home. Nevertheless, Assistant Chief Crowe knew from "previous knowledge" and "past experience" that the Defendant lived there. Assistant Chief Crowe acknowledged that a person could move from a residence.

Assistant Chief Crowe testified that the police did not test the Defendant or Jerry for gunshot residue. Regarding the bedroom in which Assistant Chief Crowe found the rifle, he stated, "I don't know specifically who had been staying in that bedroom all the time, but we received information that night [from Jerry] that [the Defendant] had been staying there for a couple of weeks in that room."

Defense counsel asked what kind of clothing was in the bedroom in which the rifle was found, and Assistant Chief Crowe responded,

> It was a vast array of clothing and clutter. There was a lot of stuff in the room, and there was a lot of men's clothes in the room, all over the room and laying on the bed, and there was an area on the bed where it looked like where somebody had been laying.
>
> . . . .
>
> It seems like I may have recalled like some older women's clothes, maybe in the closet or something. We wasn't doing a search. We were just looking for a victim. But it seems like I may have remembered like some clothes, older women's clothes hanging in the closet or something.

Juan King testified that he lived in Jackson and that he did not know the Defendant. The State showed him the Remington rifle found by Assistant Chief Crowe, and he said that the gun belonged to him but that he no longer possessed it. Mr. King stated that he paid $1,200 for the gun, that he bought it in 2019, and that someone broke into his home and took the gun. On cross-examination, Mr. King testified that he bought the gun in used condition and that it was stolen from his home on December 16, 2019.

At the conclusion of Mr. King's testimony, the State rested its proof. The Defendant did not present any evidence, and the jury convicted him as charged of felony theft of Mr. King's rifle and resisting arrest. The jury found him not guilty of evading arrest and disorderly conduct. The State then presented proof regarding the remaining two charges of possession of the rifle and a Sig Saur handgun after having been convicted of a violent felony.

Officer Joe Puente of the HPD testified that as a result of Assistant Chief Crowe's finding the Remington rifle at 521 Frankie Lane on January 5, 2020, Officer Puente obtained and executed a search warrant at the home on January 7, 2020. The house had three bedrooms, and Jerry Hart was using one of the bedrooms. In the other two bedrooms, which were across the hall from Jerry's bedroom, Officer Puente found "a lot of evidence that you could tell that [the Defendant] . . . was staying and occupying both of those bedrooms." Specifically, Officer Puente found "clothing that belonged to [the Defendant]" and a probation and parole identification card with one of the Defendant's aliases on it. Officer Puente said he knew the clothing belonged to the Defendant because "Jerry is a lot smaller than [the Defendant] and the clothes that was found was bigger clothing that would fit and match [the Defendant] instead of Jerry." Officer Puente also found in one of the two bedrooms a black nine-millimeter Sig Saur pistol and "some seven-mag shells like the ones that you saw earlier." The pistol was underneath a chest of drawers "like somebody shoved it under in that back bedroom where [the Defendant's] belongings was."

On cross-examination, Officer Puente acknowledged that the three bedrooms were in close proximity to each other. He also acknowledged that the Defendant and Jerry were similar in height but that he did not know their weights. After the police cleared the home on January 5, Jerry was allowed to remain there. There was a photograph on the Defendant's parole identification card, but Officer Puente could not determine if the photograph matched the Defendant. As for the name on the card, Officer Puente explained that "we do have a list from Tennessee Department of Correction (TDOC) that has his different aliases that he uses, and one of those aliases [was] on the card." Officer Puente did not find any mail addressed to the Defendant, and the police tested the rifle for fingerprints but did not find any prints.

- 6 -

Officer Puente testified that Jerry was present for the January 7 search but that the Defendant was still in jail. Although Jerry was prohibited from possessing firearms, police officers found guns, drugs, and drug paraphernalia in Jerry's bedroom on January 7. Jerry told Officer Puente that the Defendant "used" the two bedrooms across the hall from his bedroom, and the police knew that 521 Frankie Lane was the Defendant's "primary residence." Defense counsel asked if Officer Puente knew the Defendant had been "out of jail" only twenty-two days at the time of the January 7 search, and Officer Puente said no. Officer Puente spoke with someone at the Board of Probation and Parole and learned the Defendant had "had a change of address."

On redirect examination, Officer Puente testified that Jerry denied possessing the pistol that was in the Defendant's bedroom on January 7. However, Jerry acknowledged possessing the other firearms that the officers found during the search. On recross-examination, Officer Puente acknowledged that the police initially charged both the Defendant and Jerry with theft of the rifle. At the conclusion of Officer Puente's testimony, the State rested its proof.

The Defendant testified that his mother owned 521 Frankie Lane and that he grew up there. However, he moved out when he was sixteen years old and did not have a key to the home. On December 9, 2019, the Defendant was released from prison and placed on parole. Upon his release, he reported his address as 105 Carroll Street in Jackson. The Defendant was living at 105 Carroll Street on January 5, 2020. He said that he had a California driver's license and a Tennessee identification card and that 105 Carroll Street was the address on his identification card. The Defendant also owned a Cadillac that was registered to 105 Carroll Street, and his mail was being delivered there.

The Defendant testified that on January 5, 2020, he drove from Jackson to 521 Frankie Lane to check on his brother, Jerry, who lived in the home. The Defendant's mother had asked him to check on Jerry. The Defendant was planning to return to Jackson, but someone stole his car from the back yard. Defense counsel asked if the Defendant had a key to 521 Frankie Lane, and the Defendant said yes. He then immediately stated that he did not have a key to 521 Frankie Lane but that he had a key to 105 Carroll Street. The Defendant said that he did not know of any aliases and that some of his "[o]ld clothes" may have been in one of the bedrooms. He described the clothes as "real small like teenage clothes." Jerry used drugs and kept drugs in the home, but the Defendant "had no idea" Jerry had guns in the house. The Defendant said he and Jerry "kind of grew apart" as adults. In 2016, Jerry stole money from the Defendant and "concocted a story" to the police that the Defendant hit Jerry with a weapon.

On cross-examination, the Defendant testified that he did not own 521 Frankie Lane but that he thought he had a right to be there because his mother owned the property. The Defendant's father used to live in the home with Jerry, and Jerry took care of their father. After their father passed away, Jerry began selling family heirlooms for drugs, so the Defendant went to the home on January 5 to see what items were missing. The Defendant could not leave because someone stole his car, and he had been at the property about five hours when the police arrived.

The Defendant testified that he was asleep in a trailer that was parked in the driveway when he heard a "commotion." He walked outside to the stop sign and was looking down the street when he saw two cars pull up. He then saw four people holding guns and walking toward him. The Defendant did not know they were police officers because it was dark, and he was scared and walked away. He acknowledged that he was "aggressive" with the officers when they approached him but said that he was aggressive because they came onto his mother's property.

The State asked why the Defendant had ammunition on his person on January 5. The Defendant explained that his father kept a glass bowl containing "coins and stuff" and that he grabbed some items out of the bowl to remember his father before Jerry sold everything. The Defendant acknowledged having prior convictions for aggravated burglary in 2019, theft of property valued more than $1,000 in 2017, theft of property valued more than $10,000 in 2017, and burglary in 2012. The Defendant said the police officers were lying or mistaken when they testified that he lived at 521 Frankie Lane.

At the conclusion of the Defendant's testimony, the jury convicted him of both counts of possession of a firearm after having been convicted of a violent felony, aggravated burglary. On May 25, 2023, the trial court held a sentencing hearing. At the conclusion of the hearing, the trial court sentenced the Defendant as a Range III, persistent offender to twenty-five years for each conviction of possession of a firearm, a Class B felony, and ordered that he serve the sentences concurrently. The trial court sentenced him as a Range III, career offender to six years for theft of the rifle, a Class E felony, and to six months for resisting arrest, a Class B misdemeanor, and ordered that he serve the sentences concurrently but consecutive to the twenty-five-year sentences for a total effective sentence of thirty-one years in confinement.

## ANALYSIS

The Defendant claims that the evidence is insufficient to support his convictions of theft and possession of a firearm because the proof fails to show that he actually or constructively possessed the Remington rifle or the Sig Saur pistol. The Defendant claims

- 8 -

that the evidence also is insufficient to support his conviction of resisting arrest because the proof fails to show he used force against a law enforcement officer. The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

## I. Theft and Possession of a Firearm

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Relevant to this case, "obtain" means to "[b]ring about a transfer or purported transfer of property or of a legally recognized interest in the property, whether to the defendant or another." *Id.* at § 39-11-106(27)(A)(i). "'Obtain'" includes, but is not limited to, the taking, carrying away or the sale, conveyance or transfer of title to or interest in or possession of property." *Id.* at § 39-11-106(a)(27)(A)(ii). The trial court instructed the jury that "the term 'exercise control over property' is defined as the right to direct how property, real or personal, shall be used or

disposed. Generally, one must possess the right of possession in property in order to exercise control over it." *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 11.01. "Possession of recently stolen goods gives rise to an inference that the possessor has stolen them." *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995) (citing *Bush v. State*, 541 S.W.2d 391, 394 (Tenn. 1976)). Theft of property valued more than $1,000 but less than $2,500 is a Class E felony. Tenn. Code Ann. § 39-14-105(a)(2).

It is unlawful for a person to possess a firearm if the person "[h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon." Tenn. Code Ann. § 39-17-1307(b)(1)(A). Possession of a firearm when the person has been convicted of a felony crime of violence is a Class B felony. *Id*. at § 39-17-1307(b)(2).

Possession may be actual or constructive. *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). "[A]ctual possession refers to physical control over an item." *Id*. However, constructive possession requires only that the defendant had "the power and intention at a given time to exercise dominion and control over . . . [the item] either directly or through others." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (internal quotations and citations omitted).

In support of his claim that the proof fails to show he possessed the rifle or the handgun, the Defendant relies on *State v. Jones*, No. W2018-01421-CCA-R3-CD, 2020 WL 974197 (Tenn. Crim. App. Feb. 27, 2020), and *State v. Horton*, No. W2019-00948-CCA-R3-CD, 2021 WL 2556646 (Tenn. Crim. App. June 22, 2021). In *Jones*, the police found drugs and a handgun in a motel room in which the defendant and a codefendant were present. 2020 WL 974197, at *1. On direct appeal of the defendant's convictions for possessing drugs and a firearm, this court found the evidence insufficient, noting that the police did not find any of the contraband on the defendant's person, that no fingerprint analysis was conducted on the contraband, and that the State did not present any proof as to who rented the motel room, who possessed a key to the room, how long the defendant had been in the room, how long he intended to stay there, or whether he had any clothing in the room. *Id*. at *10.

In *Horton*, the police conducted surveillance on a home for several months and often saw the defendant present. 2021 WL 2556646, at *1. Law enforcement ultimately obtained a search warrant and entered the home, finding the defendant wearing pajamas and sitting on the couch. *Id*. Officers searched the home and, relevant to this case, discovered drugs and drug paraphernalia in a heating and air unit that was in the laundry room and hydrocodone pills in the front bedroom. *Id*. at *1, 7. Citing *Jones*, this court reversed the defendant's convictions related to the drugs and paraphernalia in the laundry

room because the State failed to present proof "to establish a link between the Defendant and the contraband hidden in the heating unit." *Id*. at \*8. However, this court affirmed the convictions related to the hydrocodone in the front bedroom because officers also found the defendant's clothing, a wallet containing his identification, and medication with his name on it in the bedroom. *Id*.

The Defendant argues that this case is "even stronger" for reversal than *Jones* and *Horton* because the police did not see him inside the home at 521 Frankie Lane. Additionally, he asserts that the police did not find a weapon on his person and that the State failed to present fingerprint evidence, failed to present evidence as to how long he had been occupying the bedrooms or intended to stay there, and failed to present evidence that the clothing in the bedrooms belonged to him. The State argues that the present case is distinguishable from *Jones* and *Horton* in that the evidence in this case shows the Defendant lived in the home and occupied the two bedrooms in which the police found the rifle and pistol.

Taken in the light most favorable to the State, the evidence shows that law enforcement received a report about shots being fired at 521 Frankie Lane. When police officers arrived, the Defendant was standing outside near the property. Upon seeing the officers, the Defendant walked toward 521 Frankie Lane and repeatedly stated that he was on his property. After the officers took the Defendant into custody, Jerry Hart arrived and gave Assistant Chief Crowe permission to enter the home. While clearing the residence, Assistant Chief Crowe found Mr. King's seven-millimeter Remington rifle under a bed in one of the bedrooms. Assistant Chief Crowe testified, without any objection by the Defendant, that Jerry said the Defendant had been staying in that bedroom for a couple of weeks. Significantly, the rifle had been stolen from Mr. King's home less than one month prior to January 5 and just one week after the Defendant had been released from prison. A blister case found with the rifle contained ten rounds of seven-millimeter ammunition, and two rounds were missing from the blister case. Sergeant Rhodes found a seven-millimeter spent cartridge casing close to where the Defendant had been standing outside, and the casing was clean like it had not been there for a long time. Although the Defendant claimed at trial that he was at the home on January 5 to check on Jerry, Jerry was not present when the police arrived.

Two days later, Officer Puente found a Sig Saur pistol in a second bedroom of the home. Officer Puente testified, without any objection from the Defendant, that Jerry claimed the Defendant was staying in the two bedrooms where the rifle and pistol were located. In those bedrooms, officers found male clothing that was the same size as the Defendant, but not Jerry. Officer Puente also found a parole identification card with one of the Defendant's aliases on it in one of the bedrooms. Jerry, who was prohibited from

possessing firearms, accepted responsibility for the firearms that the police found in his bedroom but not the rifle or the pistol. *See State v. Atwood*, No. M2021-00690-CCA-R3-CD, 2022 WL 554384, at \*3 (Tenn. Crim. App. Feb. 24, 2022) (noting that, in finding evidence sufficient for jury to conclude defendant constructively possessed prohibited weapon, witness claimed ownership of all the weapons except the one allegedly possessed by defendant), *perm. app. denied* (Tenn. June 8, 2022). Accordingly, we conclude that the evidence was sufficient for a reasonable jury to conclude that the Defendant was responsible for the theft of Mr. King's rifle and that the Defendant possessed the rifle and pistol.

## II. Resisting Arrest

Tennessee Code Annotated section 39-16-602(a) provides that:

[i]t is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at the officer's direction, from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another.

"'Force' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(14). This court has upheld a conviction for resisting arrest when the defendant "flailed his arms and struggled with the officers." *State v. Tidwell*, No. 01C01-9807-CC-00288, 1999 WL 436840, at \*3 (Tenn. Crim. App. June 30, 1999). This court also has upheld a resisting arrest conviction when the defendant "caus[ed] the officer to 'wrestle' him before handcuffing him." *State v. Lee*, No. 03C01-9410-CR-0039, 1995 WL 395840, at \*5 (Tenn. Crim. App. July 6, 1995).

Taken in the light most favorable to the State, the evidence shows that the Defendant began walking toward 521 Frankie Lane when he saw Officer Carter and Sergeant Rhodes approaching him. Officer Carter told the Defendant to stop, but the Defendant refused and continued walking toward his home. When the officers caught up to the Defendant and tried to detain him, the Defendant pulled away and struggled with them. Sergeant Rhodes deployed his taser on the Defendant and tried to "dry stun" him several times, but the officers still were unable to take him into custody and had to hold him until other officers arrived and helped them handcuff the Defendant. Officer Carter's bodycam video shows the Defendant cursing and struggling to avoid being handcuffed. Thus, we conclude that the evidence is sufficient to support the Defendant's conviction of resisting arrest.

## CONCLUSION

Based upon the oral arguments, the record and the parties' briefs, we affirm the judgments of the trial court.

_____

JOHN W. CAMPBELL, SR., JUDGE